**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **GLOBAL ADVANTECH RESOURCES LIMITED,** <br><br> **Plaintiff,** <br><br> **vs.** <br><br> **DALE HAYES, HARLAN CHAPPELLE, JAMES HACKETT, AND DOES 1-20,** <br><br> **Defendants.** | § § § § § § § § § § § § § § § | **CASE NO. 4:22-cv-03968** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Global Advantech Resources Limited ("GA") complains against Defendants Dale Hayes ("Hayes"), Harlan Chappelle ("Chappelle"), James Hackett ("Hackett"), and Does 1-20. Unless otherwise stated herein, Defendants collectively refers to all Defendants.[1] Plaintiff's allegations are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on investigation by and through Plaintiff's attorneys, including, *inter alia*, review of related: (1) filings with the U.S. Securities and Exchange Commission ("SEC); (2) presentations, press releases, and news and media reports; (3) documents,

[1] Plaintiff will seek entry of an order granting relief from the pending automatic bankruptcy stay in the bankruptcy proceedings captioned *In re: Alta Mesa Resources, Inc. and Alta Mesa Holdings, LP*, Case No. 19-35133-H1- 11 (S.D. Tex. Bankr.) (the "Bankruptcy Proceedings") for the limited purposes of allowing Plaintiff to prospectively amend Plaintiff's instant Complaint to further pursue a declaratory judgment herein that the related debtor entities High Mesa Holdings, LP ("HMH") and Alta Mesa Holdings, LP ("AMH) are also liable to Plaintiff hereunder. Plaintiff will seek leave of the Court as appropriate to amend this Complaint to include AMH and HMH as defendants herein.

transcripts and exhibits from the Bankruptcy Proceedings; and (4) other material and data concerning the Defendants and related entities and participants identified herein.[2]

## I. INTRODUCTION

1. This is a cross-border dispute by a British innovation, development, and product delivery company against the controlling principals of, broadly speaking, an expansive preexisting U.S. oil and gas enterprise based in Houston, Texas that has since availed of and been acquired, in whole or in part, in the referenced Bankruptcy Proceedings pursuant to a §363 Asset Purchase Agreement ("APA"). This also is, as a result, a direct and indirect action in which Plaintiff seeks redress from the controlling principals both directly and indirectly. The gravamen here is Defendants' and related entities' deception in obtaining and subsequently misusing Plaintiff's confidential and proprietary information in connection with their illicit activities. And underlying it is the proposition that Defendants and related entities are solidarily *alter egos* (one and the same) with the theme and thread being their inextricably intertwined linkage by, between, and amongst one another within a single, concerted, centrally dominated association-in-fact enterprise (referred to herein as the "Enterprise")[3] emanating from and orchestrated by them and those acting in concert with them through systematic corporate relationships, contractual arrangements, financial ties, and active coordination.[4]

---

[2] Counsel's investigation into the factual allegations continues, and many of the relevant facts are inherently known only by Defendants or are exclusively within Defendants' and their various related entities' custody or control. Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

[3] Plaintiff herein adopts "Enterprise" as a matter of grammatical ease of reference to avoid repeatedly adding disruptive explanatory phrases and terminology to identify the singular character of Defendants' overall corporate structure.

[4] The term "*alter ego*" is used here by way of short-hand reference to the overarching construct in which the corporate fiction or veil is pierced or disregarded ("a rose is still a rose by any other name"). Of course, this begs the question of what is meant by metaphors like "*alter ego*" or the myriad other oft-used terms similar in meaning, *e.g.*, "puppet," "artifice," "dummy," "sham," "conduit," "unfair device," etc. It also leaves open the situations in which *alter ego* is applied. While the questions are easily stated, history is replete with proof that despite many attempts to solve the puzzle, the solution remains decidedly a mystery by purpose and necessity as equally amorphous are the circumstances in which the corporate fiction is undone in reality. *Alter ego* and resulting veil-piercing cannot be so simplistically

2. Plaintiff's confidential and proprietary technical and commercial information was essentially directly and indirectly attained by Defendants and their puppet-like entities AMH/HMH on false pretenses and subsequently used surreptitiously to wrongfully foster their ulterior motives at Plaintiff's substantial detriment. More specifically, Defendants and their Enterprise including AMH and HMH feigned interest under the guise of acquiring information, expertise, and equipment from Plaintiff when they actually sought to undermine the propriety of employing Plaintiff's technology. As more fully described below, Defendants effectively exercised their domination and control as principals and agents of predecessor and successor entities alike to orchestrate a "bait and switch" on Plaintiff.

3. Plaintiff's claims accordingly arise out of Defendants' concerted acts, representations, assurances, omissions, and deceit to wrongfully obtain and subsequently misuse Plaintiff's confidential and proprietary information by and through the Enterprise including AMH and HMH and others acting in concert. Plaintiff collectively and alternatively sues Defendants for actual and constructive fraud and deceit (including fraudulent inducement), together with declaratory judgment, civil conspiracy, piercing the corporate veil, actual (direct and consequential) damages, punitive or exemplary damages, attorneys' fees, costs, and pre- and post-judgment interest.

---

confined to a single principle that defines the circumstances for their application. "Abuse" is as broad a concept as human imagination demands and inevitably occurs in an equally wide range of situations. Any attempt to rigidly confine and define that which cannot be so restricted invariably will prove futile and frustrate legitimate claims. *Alter ego* and resulting veil piercing thus rightly reflect a wide latitude needed to respond to the myriad forms or faces abuse may assume. As every argument to disregard or pierce the corporate veil essentially is an invitation to uphold a right or policy that competes with those underlying the separate entity rule, equity only is achieved by directly addressing the interests at stake, rather than by applying a set of fixed rules. Like its fraud analogue, *alter ego* "needs no definition; it is as old as falsehood and as versable as human ingenuity." *Gregory v. United States,* 253 F.2d 104 (5th Cir. 1958) (quoting *Weiss v. United States,* 122 F.2d 675, 681 (5th Cir. 1941) (internal quotation mark omitted).

## II. PARTIES

### A. Plaintiff

4. Plaintiff GA is a company registered in England whose registered office is at 33 Wolverhampton Road, Cannock, WS11 1AP, United Kingdom. Plaintiff develops and markets products and systems for industrial wastewater and effluent treatment and reclamation and recycling for hydrocarbon and solids decontamination and for emissions and odor control.

### B. Defendants and Related Participants

#### i. Defendants' Bankrupt Enterprise

5. Defendants are all related to the now bankrupt oil and gas Enterprise generally referred to as Alta Mesa as it evolved up to and through what has been referred to as a "Business Combination" and the subsequent filing of a series of voluntary bankruptcy petitions in the jointly administered Bankruptcy Proceedings pending in the U.S. Bankruptcy Court for the Southern District of Texas, the Honorable U.S. Bankruptcy Judge Marvin Isgur presiding.

6. The Business Combination occurred in 2018 roughly two years before the ensuing Bankruptcy Proceedings and involved a series of transactions whereby Silver Run Acquisition Corp. II ("Silver Run"), a blank-check special purpose acquisition company ("SPAC") created by Riverstone Holdings LLC ("Riverstone"), acquired the combined interests of AMH and regional pipeline company Kingfisher Midstream LLC ("KFM") through two newly formed subsidiaries, SRII Opco GP, LLC and SRII Opco LP (collectively, "SRII").[5] AMH contributed "upstream" interests and activities in proved and unproved oil and gas properties located in an area of the

[5] A SPAC is essentially a shell company that exists solely to raise funds through an initial public offering ("IPO") that are then used to acquire another company. *See, e.g., In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 527 (D. Del. 2012); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 280, 288 (S.D.N.Y. 2012).

Anadarko Basin commonly referred to as the STACK;[6] while KFM contributed "midstream" gathering, processing, transporting, and marketing operations in the area. Silver Run renamed itself Alta Mesa Resources, Inc. ("AMR"), a publicly traded corporation traded under the ticker AMR.

7. Contemporaneous with consummating the Business Combination, AMH evidently transferred its non-STACK oil and gas assets and liabilities, *e.g.*, those involving Idaho and as pertains in particular to the claims herein, to HMH with HMH indemnifying Alta Mesa for liabilities arising from those non-STACK oil and gas assets.

8. Throughout all this and in all relevant respects and times, Defendants owned, dominated, and controlled the overall operative Enterprise through overlapping owners and interests. This is true before and after the Business Combination as well as the ensuing Bankruptcy Proceedings. Defendants basically took private companies public to amass capital for their substantial benefit and then effectively retraded it in bankruptcy—shedding liabilities while retaining benefits.

9. Prior to the Business Combination, AMH was an upstream oil and gas exploration and production company founded in 1987. AMH was in turn owned by HMH. High Mesa Holdings GP, LLC ("HMH GP") was the sole general partner of both AMH and HMH, and High Mesa, Inc. ("HMI") held a majority of the outstanding limited partner interests in HMH and all of the outstanding limited liability company interests in HMH GP. HMH also was a partial owner of KFM prior to the Business Combination. Defendants Chappelle, Hackett, and Hayes were each insiders who in concert with Riverstone, Bayou City Energy Management, LLC, ("BCE"), and

---

[6] An acronym for the (**S**ooner **T**rend (oil field), **A**nadarko (basin), **C**anadian and **K**ingfisher (counties)) play in Oklahoma).

HPS Investment Partners, LLC ("HPS") in turn likewise owned, dominated, and controlled the Enterprise including AMH and HMH.

10. From 2004 forward up until the end of 2018, Defendant Chappelle was an owner and the President, Chief Executive Officer ("CEO") and a Director of AMH. He also was an owner and the President and CEO of HMH and an officer and/or director of many if not all AMH's and/or HMH's numerous related entities. Defendant Hayes also was an owner of HMH and served as AMH's Vice President, Frontier Operations. Defendant Hackett was the Chief Operating Officer ("COO") of KFM, a Partner at Defendant Riverstone and co-head of its Houston office. Prior to joining Riverstone in 2013, Hackett served as Chairman and CEO of Anadarko Petroleum Corporation.

11. HMH continued to partially own and control AMR and SRII Opco following the Business Combination. Riverstone, BCE, and HPS all likewise continued to partially own and control Alta Mesa and SRII Opco following the Business Combination. Following the Business Combination, Defendant Chappelle was the CEO of the combined AMR entity as well as a member of AMR's Board of Directors. Defendant Chappelle also retained his roles as President and CEO of AMH and HMH. Defendant Chappelle resigned from Alta Mesa, as well as AMH and HMH, effective December 26, 2018, but retained ownership interests in AMH and HMH. At that time, Defendant Hackett became AMR's Interim CEO and Chairman of the Board, as well as Executive Chairman and Interim CEO of AMH and HMH. Defendant Hayes continued to retain ownership interest in AMH.

12. In April 2020, BCE continued to preserve its preexisting interests in Alta Mesa in a joint venture with Mach Resources LLC ("Mach")—BCE-Mach III LLC ("BCE-Mach")—to repurchase substantially all the upstream oil and gas assets of AMH and its subsidiaries, along

with the midstream assets of affiliate KFM and its subsidiaries pursuant to the bankruptcy §363 APA. BCE substantially owned AMH and HMH prior to the Business Combination, was a major shareholder of AMR thereafter, and appointed its Managing Partner William McMullen and other Partner Mark Stoner, who was the Vice President of Finance at AMH before joining BCE, to AMR's Board of Directors.

13. Notably, insofar as Alta Mesa related entities have sought bankruptcy protection in the Bankruptcy Proceedings, Plaintiff's claims herein were neither listed or otherwise included and Plaintiff received no notice thereof.

**ii. Individual Insider Defendants**

14. Defendant Hayes is an individual citizen of the United States of America whose last known residence is at 2815 Sundance Summit Lane, Katy, Texas 77494. At all relevant times, upon information and belief, he partially owned, dominated, and controlled AMH and HMH and is an alter ego of both. He personally communicated with Plaintiff, both by himself and together with other representatives and advisors of the Enterprise, throughout 2017 and 2018 to first knowingly or recklessly induce Plaintiff to participate with and provide its confidential and proprietary wastewater treatment information to Defendants and the Enterprise including AMH and HMH under false pretenses, including, without limitation, the nature, character and outlook of their activities; and subsequently compound and perpetuate matters with more misrepresentations. He may be served with process pursuant to the Federal Rules of Civil Procedure and Texas Rules of Civil Procedure by serving a copy of the summons and this Complaint at his dwelling house, usual place of abode and/or place of regular conduct of a business or profession.

15. Defendant Chappelle is an individual citizen of the United States of America whose last known residence is at 31 Hammock Dunes Place, Spring, Texas 77389. At all relevant times,

upon information and belief, he partially owned, dominated, and controlled AMH and HMH and is an alter ego of both. Plaintiff is informed and believes, and thereon alleges, he actively and knowingly precipitated, participated in, and assented to the fraudulent scheme to induce Plaintiff to participate with and provide its confidential and proprietary wastewater treatment information to Defendants and the Enterprise including AMH and HMH. He may be served with process pursuant to the Federal Rules of Civil Procedure and Texas Rules of Civil Procedure by serving a copy of the summons and this Complaint at his dwelling house, usual place of abode and/or place of regular conduct of a business or profession.

16. Defendant Hackett is an individual citizen of the United States of America whose last known residence is at 3372 Del Monte Drive, Houston, Texas 77019. At all relevant times, upon information and belief, he partially owned, dominated, and controlled AMH and HMH and is an alter ego of both. Plaintiff is informed and believes, and thereon alleges, he actively and knowingly precipitated, participated in, and assented to the fraudulent scheme to induce Plaintiff to participate with and provide its confidential and proprietary wastewater treatment information to Defendants and the Enterprise including AMH and HMH. He may be served with process pursuant to the Federal Rules of Civil Procedure and Texas Rules of Civil Procedure by serving a copy of the summons and this Complaint at his dwelling house, usual place of abode and/or place of regular conduct of a business or profession.

17. Each of the Defendants took part as an insider in the materially false communications by Defendants and the Enterprise including AMH and HMH complained of herein and were aware of their materially false and misleading nature. Moreover, each of the Defendants knew (or recklessly disregarded) that the false representations would be relied upon by Plaintiff to its detriment.

18. Each of the Defendants participated for their personal benefit in a fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiff.

**iii. Doe Defendants**

19. Plaintiff is presently unaware of the names of Defendants identified herein as Does 1-20, inclusive, and therefore sues them by those fictitious names. The identities and service addresses for Does 1-20 cannot be known until certain discovery occurs in these proceedings. Plaintiff is informed and believes, and thereon alleges, that Defendants sued herein as Does are responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or coconspirators, alter egos, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants, and each of them. Plaintiff will further seek leave of the Court as appropriate to amend this Complaint to allege the true names and capacities of the Doe Defendants, and the roles they played, once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

**C. Related Participants**

20. In addition to the Defendants, reference is made to the following present and former affiliates of Defendants, all of which were involved in relevant respects and related to, affiliated with, owned, or have been owned, in whole or in part, by Defendants or one of their entities during the periods relevant here.

**i. Enterprise Entity Participants**

21. AMH is, as described above, a Texas based holding company reportedly founded in 1987 and subsequently acquired in 2018 as part of the Business Combination before being placed into the Bankruptcy Proceedings and effectively reacquired through the bankruptcy §363

APA. It reportedly provides, by and through its related entities, development, acquisition, exploration, and production of oil and natural gas properties and included interests, dealings, and operations in Idaho before evidently transferring those involving Idaho and as pertains in particular to the claims herein, to HMH.

22. HMH is, as described above, an owner of AMH before and after the Business Combination before being placed into the Bankruptcy Proceedings pending liquidation. As indicated, AMH reportedly transferred interests involving Idaho and as pertains in particular to the claims herein to HMH.

**ii. <u>Control Entity Participants</u>**

23. Riverstone is a private equity firm focused on the energy sector and is comprised of, as relevant hereto, Riverstone Holdings, LLC, Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. Defendant Riverstone and its affiliates created Alta Mesa and sponsored the IPO and the Business Combination through various related affiliates and investment vehicles. Prior to the Business Combination, all of Alta Mesa's management was employed by Riverstone. Following the Business Combination, Riverstone appointed three directors to Alta Mesa's Board of Directors—including Defendant Hackett.

24. BCE is an energy-focused private equity firm based in Houston, Texas. BCE has been reportedly involved with AMH since at least January 2016, when it entered into a joint development agreement with AMH to fund a portion of AMH's drilling operations. BCE also reportedly owns approximately 40% of HMH (the owner of AMH prior to the Business Combination and a partial owner of Alta Mesa following the Business Combination). BCE has two members on HMH's board of directors and appointed its founder and managing partner William McMullen to the Alta Mesa Board of Directors. As referenced above, BCE-Mach III has

now reacquired both the upstream assets of AMH and its subsidiaries and the midstream assets of KFM and its subsidiaries.

25. HPS is a global investment firm. HPS was formerly affiliated with J.P. Morgan Asset Management and was known as Highbridge Principal Strategies. HPS owns a significant portion of Alta Mesa and appointed one of its managing directors, Don Dimitrievich, to the Alta Mesa Board of Directors.

26. Riverstone, BCE, and HPS are each sometimes hereafter referred to as a "Control Entity Participant" and collectively as the "Control Entity Participants."

#### iii. Professional Participants

27. At every step of the way, the insiders were further aided and abetted by lawyers, accountants and advisors. Those professionals repeatedly aligned with the insiders, gave effect to their scheme, and helped hide the nature and consequences of their scheme from Plaintiff and the public-at-large alike. Some worked to formulate and enact the scheme. Some acted to cover it up. And some did both. In sum, officers, directors and advisors worked in concert, along with others who acted and/or failed to act, to execute this unlawful scheme. And AMH and HMH, by and through their perpetrators, further compounded and perpetuated their scheme by relentlessly spawning and maintaining an ongoing cover-up rooted in misrepresentations and omissions.

### D. Alter Ego Allegations

28. At all relevant times herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants and the Enterprise including AMH and HMH and others acting in concert including the Control Entity Participants, and in doing so acted within and in furtherance of the course and scope of such agency, employment, co-

conspiracy, alter-ego and/or joint venture. Each of the Defendant's acts alleged herein was done with the tacit knowledge and consent of each of the other Defendants.

29. At all relevant times herein, Defendants, in concert with the Control Entity Participants and others, were each separately and collectively the guiding spirits and alter egos of the Enterprise generally and AMH and HMH specifically. There existed a unity of interest and ownership between and amongst them such that any separateness ceased to exist. AMH and HMH possessed no separate mind, will, or existence of their own independent of Defendants and others acting in concert. AMH and HMH had no functional or meaningful existence independent of them. Defendants thoroughly controlled, dominated, managed, and operated AMH and HMH to suit their convenience, advantage, and benefit. They simply were pass through conduits or vehicles within the Enterprise through which Defendants and others acting in concert acted for their personal benefit to inflict harm directly and indirectly on Plaintiff.

30. Specifically, because of their roles and positions, Defendants possessed the power and authority to control the Enterprise including AMH and HMH. As such, Defendants: (1) controlled the business and affairs of the Enterprise including AMH and HMH; (2) disregarded legal formalities and failed to maintain arm's length relationships between and amongst corporate entities within the Enterprise including AMH and HMH; (3) used the same office or business location and employed the same employees for the corporate entities within the Enterprise including AMH and HMH; (4) used corporate entities to conceal ownership, management, and financial interests within the Enterprise including AMH and HMH; (5) commingled the funds and assets of the corporate entities within the Enterprise including AMH and HMH (6) diverted corporate funds and assets within the Enterprise including AMH and HMH to their benefit; (7) manipulated the assets and liabilities between corporate entities within the Enterprise including

AMH and HMH to concentrate assets in one and liabilities in another; (8) transferred assets between and amongst the Enterprise including AMH and HMH and themselves and others acting in concert without reasonably equivalent value for the purpose of delaying or hindering creditors, including Plaintiff; (9) inadequately capitalized AMH and HMH; (10) used the corporate entities within the Enterprise including AMH and HMH as a mere shells, instrumentalities or conduits for themselves and/or individual business interests; (11) used corporate entities within the Enterprise including AMH and HMH to create confusion between separate properties, records, and control; and/or (12) used corporate entities within the Enterprise including AMH and HMH to shield against claims, liabilities, and obligations, including, in particular, those alleged herein.

31. Plaintiff is informed and believes that at all relevant times mentioned herein, the acts of the Enterprise including AMH and HMH were performed directly by Defendants or indirectly by an employee, agent, officer, servant and/or representative of the Enterprise including AMH and HMH acting at the behest of and in concert with Defendants. Operating by and through channels and directives mandated by Defendants and those acting in concert with them, Defendants dominated and directed the affairs of the Enterprise including AMH and HMH and used the Enterprise's other members as instrumentalities to carry out and implement their overarching and indomitable will for their personal benefit.

32. Acting by, between, and amongst one another and others acting in concert in furtherance of the Enterprise's activities including AMH and HMH, the conduct of each may be solidarily imputed to one and all with Defendants each likewise deemed one and the same for all relevant purposes, including but not limited to systematic, continuous, and substantial mistreatment of Plaintiff. Within and by means of Defendants ever-evolving Enterprise

continuum, Defendants wrongfully took and misused Plaintiff's legitimate legal interests in its confidential and proprietary information for their personal benefit.

33. Defendants thus not only dominated and controlled the Enterprise including AMH and HMH such that any separateness ceased to exist, but did so in furtherance of enabling, facilitating, and perpetuating a sham to perpetrate a fraud upon Plaintiff for their personal benefit. Adherence to the fiction of their separate existence would, under the circumstances, sanction fraud, defeat public interests, and promote injustice.

34. Justice requires recognizing the substance of the relationship over the form because the corporate fiction distinguishing between Defendants and the Enterprise including AMH and HMH was utilized to perpetuate a fraud and otherwise defeat a rightful claim by Plaintiff.

35. An equitable result is achieved by disregarding the corporate form and holding Defendants indirectly liable for the acts, representations, assurances, omissions, deceit, and breaches of the Enterprise including AMH and HMH as the corporate entities have been drained of assets and are insolvent or have insufficient assets to satisfy Plaintiff's claim. Without piercing the corporate veil, Plaintiff will be unable to recover damages from them.

## III. JURISDICTION AND VENUE

36. Diversity jurisdiction inescapably applies and attaches to this cross-border dispute. This Court accordingly has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a foreign subject and citizens of the United States.

37. This Court has general and specific personal jurisdiction over Defendants. Defendants have purposefully availed themselves of the privilege of conducting business in the State of Texas. Defendants also either in whole or in substantial part committed the acts and

practices in furtherance of Defendants' scheme complained of herein in the State of Texas. And in furtherance thereof, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

38. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and (d), because many of the acts and practices made in furtherance of Defendants' scheme complained of herein occurred in substantial part and/or had an effect in this District, and because all Defendants reside in this District.

## IV. FACTUAL BACKGROUND

### A. Plaintiff's Preexisting Wastewater Solutions Business

39. Plaintiff has been in the business by various iterations of developing, marketing, and distributing for sale wastewater treatment services, products, and systems for many years.

40. Plaintiff created its products and systems for wastewater treatment through its extensive time, labor, skill, and money.

41. In the course of its business, Plaintiff creates and maintains a great deal of highly confidential and proprietary information, including business, financial, scientific, engineering, and technical information such as system costs and performance data, designs, methods, techniques, processes, procedures, prototypes, tools, and schematics.

42. Such information relates to Plaintiff's wastewater treatment technology and is not readily ascertainable through proper means by persons not employed by, and under a confidentiality obligation to, Plaintiff. Conceived of and developed solely by Plaintiff and not available through any other channel, the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by others.

43. Plaintiff's confidential and proprietary wastewater treatment information is of great value to Plaintiff. This information is used in connection with Plaintiff's products and services, which are offered throughout the world. It is crucial to the operation of Plaintiff's business, and, if improperly used or disclosed to others, would impair Plaintiff's business.

44. Plaintiff maintains the secrecy and confidentiality of its wastewater treatment information, including by sharing such information on only a confidential basis, requiring contracts that prohibit, among other things, unauthorized access, uses, and disclosure. Such information cannot be properly acquired or duplicated because of the limited number of individuals who can access the information, and the contractual limitations imposed on such individuals.

**B. The Underlying Relations**

45. Defendant Chappelle reportedly complained in a February 1, 2017 article in the Idaho Statesman about the cost of disposal of produced water in Idaho and the refusal of the state environmental regulator to permit the use of disposal wells, thereby causing serious impact upon the financial viability of AMH's operations within the state.[7] The very next day, February 2, 2017, Defendant Hayes contacted Plaintiff as a representative of Alta Mesa Services, LP to inquire whether Plaintiff had any shops in the USA. Upon reply, Defendant Hayes went on to ask about a water treatment system to treat wastewater produced in Idaho as a by-product of oil and gas operations there. He said AMH currently collected and trucked their produced water to a third-party disposal company but wanted to reduce their water disposal costs.

46. In furtherance thereof, Defendant Hayes signed a Confidentiality and Non-Circumvention Agreement (hereafter referred to as the "NDA") on February 10, 2017, as a Vice

[7] *See* Rocky Barker, *Alta Mesa CEO offers to give all oil and gas production, tax records to Idaho agencies*, Idaho Statesman, February 1, 2017. A true and correct copy of the article is attached hereto and incorporate herein as Exhibit ("Exh.") 1).

President of AMH. A true and correct copy of the NDA is attached hereto and incorporated herein as Exhs. 2A & 2B. As is its practice, Plaintiff called for the NDA because its proposals include confidential and proprietary technical and commercial information that Plaintiff does not want disclosed in the public domain. Nor does Plaintiff want its proposed technical solutions to a customer's problems improperly exploited or otherwise misused as here or, for example, a template for a customer issuing a request for quotation/proposal (RFQ/RFP) to other potential suppliers.

47. The NDA provides in pertinent part as follows:

> 2.1 In consideration of their mutual obligations each Party agrees with the other Party that it shall not make use of, disseminate, or in any way disclose any Confidential Information of the Discloser to any third-party, except to the extent necessary for discussions, and consultations with authorised representatives of the Recipient, and any purpose the Discloser may hereafter authorise in writing.
>
> *****
>
> 2.4 Alta Mesa will not on its own account or on behalf of any other person, firm or company, directly or indirectly, use, discuss Global Advantech's ideas or Global Advantech's supplied information with or solicit or enable a third-party to use Global Advantech's supplied information, without using Global Advantech's as a channel therefore.

48. After further review and discussions over several months, Plaintiff sent its first proposal to AMH for a packaged produced water treatment (30bbl/hour treatment capacity) system.

49. Following receipt of the first proposal, Defendant Hayes and AMH requested a revised proposal for a larger packaged produced water treatment (60bbl/hour treatment capacity) system. Plaintiff sent its revised proposal on July 7, 2017. The comparative costs between the two (smaller 30bbl/hour v. larger 60bbl/hour) systems were evident.

50. Defendant Hayes then divulged that AMH also was looking at the use of evaporation ponds as an alternative to produced water treatment. In response, Plaintiff prepared

and supplied a business case on August 17, 2017, comparing the construction, water transport, and operating costs of evaporation ponds with the installation and use of a packaged, mobile produced water treatment system in favor of the latter.

51. Further discussions ensued over several more months regarding a water treatment system and reuse of produced water in Idaho. As a result, and at the request of Defendant Hayes, Plaintiff submitted a detailed estimated operating cost breakdown for the larger revised system on December 12, 2017. More discussions followed about technical details of the larger system.

52. Early the following year, on January 10, 2018, Plaintiff requested an update. Defendant Hayes responded the same day confirming AMH still planned to drill a new prospect in 2018 and understood how long it took to manufacture a system but not how long it took to also ship it. Plaintiff replied the same day to confirm the expected shipping time.

53. Nonetheless, at the end of the month, on January 31, 2018, Plaintiff happened to come across an AP News article published several months earlier on November 28, 2017 about AMH and Idaho injection wells.[8] Excerpts of the article are reprinted below:

> "The lack of class II injection well permits is the single biggest hindrance to developing this industry in Idaho," said John Foster, spokesman for Texas-based oil company Alta Mesa.
>
> The company in southwestern Idaho has six operating production wells and nine that are capable of producing but are turned off. Foster declined to go into details but said the approval of injection wells would "absolutely" lead to more production.
>
> The company currently trucks wastewater to evaporative ponds south of Boise Airport. Foster said the trucking cost 10 times more than an injection well, and "the most environmentally safe way to dispose of it is to put it right back where we got it."
>
> *****
>
> Foster said Alta Mesa would like to get a permit for an injection well as soon as possible.
>
> "In recent months, we've had a very productive set of conservations with the EPA," he said.

[8] *See* Keith Ridler, *Idaho asks federal agency to regulate oil injection wells*, Associated Press, November 28, 2017. A true and correct copy of the article is attached hereto and incorporated herein as Exh. 3.

54. Evidently, despite what Defendant Hayes and AMH were telling Plaintiff, Defendants and their Enterprise including AMH and HMH were really pursuing the ability to use injection wells instead.

55. Plaintiff emailed Defendant Hayes the same day about the article, reiterating the comparative advantages and benefits of Plaintiff's mobile water treatment systems and requesting confirmation of AMH's previously indicated order. Plaintiff accordingly stated, in part:

> Mr Foster's statement implies that injection wells are needed for the cost effective disposal of produced water, however we worked through the financials and risk implications for the construction and use of produced water injection wells. These financials clearly demonstrate that once all of the costs associates with injection wells, including: drilling and lining, surface construction, maintenance, management and transportation water to them by trucking or pipeline, etc., are included:
>
> 1. Injection wells may not necessarily be cheaper to use for produced water disposal than evaporation ponds; and
> 2. Injection wells and evaporation ponds are demonstrably more expensive to use for produced water disposal than suitably designed produced water treatment systems.
>
> It is to be noted that the water treatment systems have the additional advantage of permitting the treated water to be reused for other purposes including the construction of wetlands, crop irrigation, etc. Further, mobile water treatment systems cut down on trucking miles to transfer produced water to an evaporation pond or injection well, reducing carbon emissions.

A true and correct copy of Plaintiff's January 31, 2018 correspondence is attached hereto and incorporated herein as Exh. 4.

56. Instead, Defendant Hayes responded later the same day with an email stating that an injection well would be the cheapest option in Idaho *provided AMH could obtain a permit to use an existing non-productive well.* He also claimed an evaporation pond would have lower operating costs than treating the produced water; even though Plaintiff had previously demonstrated otherwise in its August 17, 2017, relative costs comparison. A true and correct copy of Plaintiff's January 31, 2018 correspondence is attached hereto and incorporated herein as Exh. 5.

57. Under the circumstances, Plaintiff emailed AMH back the following day on February 1, 2018, notifying AMH that Plaintiff would not spend any more resources regarding

AMH since Defendant Hayes' email made it clear AMH had made a management decision not to go with Plaintiff's proposal:

> Thanks very much for your email and for the clarity on Alta Mesa's intended strategy and plans for disposal of its produced water. We have already presented Alta Mesa with a very detailed and stronger economic/business case for use of our mobile wastewater treatment system over the construction and use of evaporation ponds. We can provide the same for injection wells, where more than one well will be required for the disposal of Alta Mesa's produced water volumes in Idaho and to mitigate against the costly risk of a single injection well failing. But in spite of the numbers, it seems that Alta Mesa has already made the management decision to pursue only traditional disposal options, not more cost-effective, environmentally beneficial solutions. As such, we feel it is prudent and in both our interests not to place any more resources or time - yours and ours - on discussing the mobile wastewater treatment system-option.

A true and correct copy of Plaintiff's February 1, 2018 correspondence is attached hereto and incorporated herein as Exh. 6. Underscoring this, Plaintiff later discovered the earlier news article published in the Idaho Statesman on February 1, 2017, quoting Defendant Chappelle on his company's need to use disposal wells:

> Chappelle said Alta Mesa Idaho is today producing at only three of its eight oil and gas wells where production already had begun. He blamed the shutdown on the high cost of water disposal.
>
> "We currently have only three wells on continuous production due to the volume of geologic water being produced," Chappelle said. "In every other producing oil and gas state, there is a Class II injection well program so operators can put that produced water back where they found it."
>
> It's different in Idaho, Chappelle said.
>
> "The EPA's unwillingness to grant Idaho authority for a Class II injection well program means a significant amount of oil, gas and (natural gas liquids) will simply be abandoned as uneconomic," Chappelle said. "As a result, mineral owners, taxing authorities, our investors, field contractors, local businesses supporting our industry and the state of Idaho will never see revenue they otherwise might."

*See* Exh. 1 *supra*.

58. Then, over ten months later, on November 16, 2018—without having any communications from AMH since January 30, 2018—Plaintiff received another email from Defendant Hayes purportedly under the auspices of Alta Mesa Resources. A true and correct copy of Defendant Hayes' November 16, 2018 correspondence is attached hereto and incorporated herein as Exh. 7. In his email, Defendant Hayes divulged AMH submitted all of Plaintiff's first

proposal in support of an application to authorities in Idaho *for permission to use disposal wells for produced water*. And in so doing, Defendant Hayes acknowledged the corresponding release—and consequential misuse—of Plaintiff's confidential technical and commercial information.

59. Evidently pressed by the Idaho regulators to whom Plaintiff's information had been improperly divulged, Defendant Hayes wanted Plaintiff to remove Plaintiff's copyright and give a retrospective waiver for the unauthorized disclosure of Plaintiff's original June 2017 proposal:

> We need to ask your forgiveness and ask for a favor, if you agree with our request.
>
> We used some of the information from your 5/6/2017 Proposal for Packaged Produced Water Treatment Systems, to give credence to our argument with a regulatory agency. We needed to show that the costs associated with drilling and producing and treating water from a potential subsurface water / residual hydrocarbon reservoir was not economically attractive as an aquifer to be used for drinking or other agricultural use. This needed to be proved due to the unique laws in Idaho that make all water productive zones subject to aquifer protection rules. We wanted to use this zone as a water disposal interval, since we had already drilled a dry hole and tested this interval and found it to contain slightly saline water and residual natural gas and VOC's. We used cost estimates from our experience in drilling, constructing facilities, and local cost factors, along with some of the quoted costs in your proposal. It appears that the entire GA proposal was submitted to the regulatory agency and now there have been requests from the public for copies of this documentation. We now realize that we should have obtained your consent before we submitted the documents to them. The regulatory folks are seeing the copyright information in the documentation you provided, and are asking if it is possible to remove the copyright? We don't expect any broad dissemination of this information because it is highly technical in nature and very few will have the appetite or capability to consume and digest the information. Would it be possible for you to give us a waiver for the use of the information and release of the copyright, for this purpose?

60. No identification or distinction was made vis-à-vis which of the various entities within the Enterprise, let alone which individuals, specifically submitted the confidential technical and commercial information to the authorities—AMH, Alta Mesa Resources, Alta Mesa Services LP, HMH, or one or more other connected entities.

61. Those copied on Defendant Hayes' email include outside counsel for AMH, Michael Christian; Scott Ricks and Mitch E. Gore, both with @high-mesa.com email addresses; and David M. Smith with an @altamesa.net email address. Notably, correspondence previously had been variously labelled from Alta Mesa Services LP, Alta Mesa Holdings LP, and later Alta Mesa Resources.

62. Nor was any prior permission to disclose Plaintiff's confidential and proprietary commercial information ever sought by anyone, let alone by anyone associated with AMH. And Plaintiff would not have agreed to it in any event. On November 21, 2018, Plaintiff accordingly responded to Defendant Hayes and several other Enterprise related representatives informing them as an initial matter that Plaintiff had retained counsel and would be further responding. A true and correct copy of Plaintiff's November 21, 2018 correspondence is attached hereto and incorporated herein as Exh. 8.

63. Counsel for Plaintiff, Claire Grainger ("Grainger"), with Naji Beidoun Advocates & Legal Consultants in Abu Dhabi of the United Arab Emirates, subsequently tried to contact Defendant Hayes in early 2019 after the holidays only to learn he was no longer at AMH. Hearing nothing further, Grainger thereafter provided written legal notice to AMH by letter dated June 26, 2019, demanding compensation and damages. A true and correct copy of Grainger's June 26, 2019 letter is attached hereto and incorporated herein as Exh. 9. In the notice, Grainger recounted the background culminating in Defendant Hayes' email admitting the unauthorized disclosure of Plaintiff's confidential and proprietary information, concluding:

> The admission above demonstrates that on 31st January 2018, when Dale Hayes emailed our Client stating Alta Mesa had found "a cheaper option" this was not factually correct. Alta Mesa had used Our Clients confidential information to bypass strict laws in Idaho regarding Injection Wells, this can be corroborated by Idaho news articles clearly documenting the long-term issues your company faced with the State. Further, Dale Hayes email dated 16th November 2018, Dale Hayes had confirmed that Alta Mesa used information and costs from Our Client's proposal dated 5th June 2017 in their permit application to attempt to convince the regulatory authorities that the costs associated with treating the volumes of water produced by oil and gas operations were economically viable compared to using injection wells for disposal of the water. Dale Hayes also confirmed that Alta Mesa had included the complete 5th June 2017 proposal in its permit application to the state authorities.

The notice further pointed out the misleading tenor of the disclosure:

> For your understanding the 5th June 2017 Proposal was the first of two proposals and is misleading in terms of the costs and commercial viability of using Our Client's produced water treatment systems. This system is for a 30bbl/hour (approx. 5m3/hour, 1bbl = approx. 157 litres) system rather than the second proposal for a system with twice the capacity of 60bbl/hour (approx. 10m3/hour) treatment system dated 07/07/2017. The difference in CAPEX and maintenance support costs per bbl of produced water treated for the two treatment systems which are $3.30 for the first proposal and $1.99 for the second proposal. Where it is shown that the total CAPEX amortised over 7 years plus maintenance support and spares per bbl. of water treated for the 30bbl/hour system is significantly higher than for the 60bbl/hour system. (The treatment cost per bbl. would be further reduced for larger capacity produced water treatment systems due to the economies in system scaling.) Undoubtedly, the significantly higher figure is the reason for Alta Mesa choose to utilise this proposal.

64. Nearly a month later, on July 17, 2019, Plaintiff received an email from Ryan McKenzie ("McKenzie") as Associate General Counsel of Alta Mesa Resources. A true and correct copy of Defendant Hayes' November 16, 2018 correspondence is attached hereto and incorporated herein as Exh. 10). While he acknowledged receipt of Plaintiff's notice, McKenzie further interposed that HMH was the proper party to notify and that he had done so:

> Please note that through a series of transactions and documents, High Mesa Holdings, LP acquired the Idaho assets and businesses that are the subject matter of this claim together with any and all liabilities and obligations associated there with. As a result, High Mesa Holdings is the appropriate company to provide notice to concerning the alleged breaches referenced in the Notice, including anything related to the Idaho businesses involved in this particular situation. Please note that the statements contained in the Notice, specifically the email correspondence dated November 16, 2018, are from High Mesa representatives and their Idaho counsel.
>
> I provided a similar notice to High Mesa Holdings, LP, and have received confirmation from High Mesa that their Idaho counsel has or will reach out to you to discuss this matter and the approaches moving forward. Additionally, the contact information for the president of High Mesa, Scott Ricks (who was a party copied on the email referenced in your Notice), is below:
>
> Scott Ricks
> High Mesa Holdings, LP
> 16600 Park Row
> Houston Texas 77084
> sricks@high-mesa.com

As noted by McKenzie and otherwise evident on the face of Plaintiff's counsel's notice, HMH was an addressee all along. Nonetheless, and notwithstanding McKenzie's representations, there was no further response forthcoming.

## V. CAUSES OF ACTION

65. All claims are plead concurrently, cumulatively, and in the alternative.

66. All conditions precedent either have been performed, have occurred, or have been excused.

67. All claims plead against Defendants Hayes, Chappell, and Hackett are plead against each both directly as active participants in relevant respects and indirectly on agency, guiding spirit, alter ego, and ultimate beneficiary grounds.

**Count I: Actual Fraud Including Fraudulent Inducement**
**(Against All Defendants Directly and/or Indirectly)**

68. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as if set forth herein.

69. Through inextricably related business entities and by means of false and fraudulent practices and deceptions, misrepresentations and omissions, Defendants and the Enterprise including AMH and HMH engaged in a preconceived business scheme or artifice to fraudulently induce and otherwise deceive and defraud Plaintiff. The purpose of Defendants' concerted scheme was to directly and indirectly enrich themselves at Plaintiff's expense by wrongfully and deceptively inducing Plaintiff into unknowingly and unwittingly providing and standing by while Defendants and the Enterprise including AMH and HMH expropriated Plaintiff's confidential and proprietary information for ulterior purposes in manipulating regulatory authorities to permit disposal wells instead of requiring wastewater treatment.

70. As a principal part and in furtherance of Defendants' scheme, Defendants and others acting in concert directly and indirectly deceived Plaintiff by decidedly: disguising the true purpose and intent of Defendants' and the Enterprise including AMH and HMH; manipulating the scope and substance of information sought from and provided by Plaintiff to create misleading impressions; disclosing Plaintiff's confidential and proprietary information to third parties without Plaintiff's knowledge, participation, or consent; disclosing Plaintiff's confidential and proprietary

information to third parties in a misleading manner; stringing Plaintiff along under false pretenses; and effectively sabotaging Plaintiff's business interests.

71. As described and delineated above, Defendants directly and indirectly solicited Plaintiff's confidential and proprietary information, including business, financial, scientific, engineering, and technical information such as system costs and performance data, designs, methods, techniques, processes, procedures, prototypes, tools, and schematics.

72. Acting directly and indirectly by and through the Enterprise including AMH and HMH and others acting in concert, Defendants made it appear to Plaintiff that they were looking to procure a water treatment system to treat wastewater produced in Idaho as a by-product of oil and gas operations there and specified a requisite volume involved. Defendants directly and indirectly supplied false and misleading information, both orally and in writing, and both affirmatively and by and omission of material facts, concerning the true purpose and intent of Defendants and the Enterprise including AMH and HMH.

73. In order to induce access Plaintiff's proprietary confidential and proprietary information, Defendants directly and indirectly precipitated the above-referenced NDA covering any information provided by Plaintiff.

74. Key terms in the NDA include:

> 2.1 In consideration of their mutual obligations each Party agrees with the other Party that it shall not make use of, disseminate, or in any way disclose any Confidential Information of the Discloser to any third-party, except to the extent necessary for discussions, and consultations with authorised representatives of the Recipient, and any purpose the Discloser may hereafter authorise in writing.
>
> *****
>
> 2.4 Alta Mesa will not on its own account or on behalf of any other person, firm or company, directly or indirectly, use, discuss Global Advantech's ideas or Global Advantech's supplied information with or solicit or

enable a third-party to use Global Advantech's supplied information, without using Global Advantech's as a channel therefore.

75. Defendants knew or should have known of the promises, representations, and assurances to maintain confidentiality and not to use the information received from Plaintiff for ulterior and otherwise unauthorized purposes.

76. Pursuant to the terms of the NDA, Plaintiff submitted confidential and proprietary information to Defendants and the Enterprise including AMH and HMH for the purposes indicated, including Plaintiff's business, financial, scientific, engineering, and technical information such as system costs and performance data, designs, methods, techniques, processes, procedures, prototypes, tools, and schematics.

77. Contrary to what Defendants and the Enterprise including AMH and HMH professed in soliciting a wastewater treatment system from Plaintiff, they deliberately misled Plaintiff in order to gain detailed confidential and proprietary information without any intention to purchase a wastewater treatment system. Defendants and the Enterprise including AMH and HMH deceptively obtained and disclosed Plaintiff's confidential and proprietary wastewater treatment information and technology in a false, negative, and disparaging manner to manipulate regulatory authorities to permit disposal wells instead of requiring wastewater treatment.

78. Defendants and the Enterprise including AMH and HMH failed to disclose material facts concerning Plaintiff's confidential and proprietary wastewater treatment information and technology. Defendants and others acting in concert specifically omitted to disclose the following to Plaintiff in furtherance of the deceitful scheme:

i. the true purpose and intent;

ii. the self-serving purpose of their requests for proposals;

iii. the Defendants dominated and manipulated the Enterprise including AMH and HMH to their own advantage;

iv. that Plaintiff was effectively being stripped of its confidential and proprietary information;

v. underlying correspondence with, deliberations of, and pronouncements with Idaho authorities; and

vi. information requested was manipulated to place Plaintiff in a negative light and disparage the feasibility of Plaintiff's products and services.

79. At all relevant times, Defendants knew or should have known of their intended ulterior purpose. Despite this knowledge, Defendants were in a position such that they were required to disclose the whole truth about their intentions, and not partial truths or make misleading disclosures.

80. Apart from omitting to disclose material information, what Defendants and the Enterprise including AMH and HMH and those acting in concert with them did say during and after first attaining and then misusing Plaintiff's confidential and proprietary information was equally misleading. They simply made up what they wanted to suit their purposes. This includes the misimpressions involving the purposes in the first place. It also includes all the misstatements and misimpressions surrounding requests for proposals, as well as the circumstances surrounding dealings with third parties and self-dealings with affiliated individuals and entities. In every respect, Defendants and the Enterprise including AMH and HMH and others acting in concert engaged in fictional and revisionist pronouncements and packaging to manipulate the circumstances associated with their illicit expropriation. They then persisted in continuing the fraud on Plaintiff by continuing to misrepresent the true facts and circumstances.

81. Defendants directly and indirectly by and through the Enterprise including AMH and HMH and others acting in concert thus participated in supplying at least the following false and misleading representations to Plaintiff, both orally and in writing, in furtherance of the deceitful scheme:

i. feigning interest in procuring a wastewater treatment system from Plaintiff in order to induce Plaintiff to provide detailed confidential and proprietary information;

ii. misrepresenting the true purpose behind encouraging Plaintiff to provide its confidential and proprietary wastewater treatment information and technology knowing that they would instead use it to manipulate regulatory authorities to permit disposal wells instead of requiring wastewater treatment;

iii. Plaintiff's confidential and proprietary information would be kept strictly confidential and would not be disclosed to third parties in violation of the NDA;

iv. Plaintiff's confidential and proprietary information would not be used for unauthorized purposes in violation of the NDA;

v. at all relevant times Plaintiff's confidential and proprietary information was being properly managed and protected; and

vi. corporate governance policies, practices, and procedures were properly instituted for and implemented on behalf of the Enterprise including AMH and HMH.

82. The representations described and delineated were intentional and in furtherance of expropriating Plaintiff's confidential and proprietary information for the illicit benefit of Defendants and their progeny. Defendants knew the representations were false, misleadingly incomplete, or made the representations recklessly, as positive assertions, and without knowledge of their veracity.

83. The direct and indirect acts, representations, assurances, omissions, and deceit of Defendants and the Enterprise including AMH and HMH and others acting in concert were intended to induce Plaintiff's reliance in providing Plaintiff's confidential and proprietary information to them and otherwise expending substantial time and resources on their requests for proposals. Defendants knew or should have known Plaintiff had entrusted Plaintiff's interests in its confidential and proprietary information and would necessarily be dependent upon and

accordingly be guided by and rely upon the false and misleading information to its substantial detriment.

84. Plaintiff justifiably relied upon the concerted acts, representations, assurances, omissions, and deceit of Defendants and the Enterprise including AMH and HMH and others acting in concert. They reasonably expected or should have expected Plaintiff to rely upon their repeated promises, representations, and assurances, and Plaintiff did in fact reasonably and detrimentally rely upon them in providing Plaintiff's confidential and proprietary property and continually foregoing other interests and expending Plaintiff's substantial time and resources on their requests for proposals.

85. Despite Plaintiff's reasonable reliance upon and clear entitlement to nondisclosure and agreed use by Defendants and the Enterprise including AMH and HMH and others acting in concert, Defendants frustrated Plaintiff's purpose and failed to use Plaintiff's confidential and proprietary information as proposed, agreed, and otherwise embodied in the NDA. Defendants did directly or indirectly disclose Plaintiff's information in an unauthorized and misleadingly disparaging manner to intentionally undermine Plaintiff's wastewater treatment products in favor of disposal wells.

86. Defendants' false and misleading expropriation and misuse of Plaintiff's confidential and proprietary information was knowing, willful and malicious. Defendants acted for their own interest at Plaintiff's expense knowing they were purposefully mischaracterizing matters in a negative light. There were reasonably available alternatives to further Defendants' legitimate business interests other than the false, misleading, and deceptive conduct described herein.

87. The fraudulent acts, representations, assurances, omissions, and deceit of Defendants and the Enterprise including AMH and HMH and others acting in concert injured Plaintiff's assets, goodwill, present and future income-generating capacity and business, and has caused Plaintiff to lose a substantial part of the benefits of the wastewater treatment business relationships it had painstakingly developed over many years.

88. Plaintiff has a preexisting wastewater treatment related business with valid relationships and expectancies from which it has and reasonably could anticipate deriving economic benefits. Plaintiff created its products and systems for wastewater treatment through its extensive time, labor, skill, and money.

89. It was readily apparent to Defendants and the Enterprise including AMH and HMH and others acting in concert, and they actually knew, that Plaintiff had these business relationships and expectancies. Upon information and belief, they were aware of Plaintiff's preexisting and prospective relationships and engagements with other parties.

90. But for the improper and deliberate conduct by Defendants and the Enterprise including AMH and HMH and others acting in concert in directly and indirectly interfering with and preventing Plaintiff from maintaining, developing, and expanding its wastewater treatment related business relationships, Plaintiff would have further developed its business, expanded its business relationships, and met its business expectancies.

91. Defendants' direct and indirect conduct has led to a material diminution of the reputation and goodwill established by Plaintiff in its products and services. Defendants have injured and will continue to injure Plaintiff's business reputation, have tarnished Plaintiff's name and products, and have lessened Plaintiff's capacity to attract and obtain business. Defendants'

conduct essentially discredited Plaintiff's viability and otherwise substantially curtailed its opportunities.

92. Defendants have thus directly and indirectly deprived and will continue to deprive Plaintiff of the ability to control the market perception of its products, systems, and services offered by Plaintiff, placing its valuable reputation and goodwill in their hands. Plaintiff has thus lost the benefits of preexisting and prospective business relationships and thereby suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiff in its products.

93. Plaintiff hereby sues Defendants either directly and indirectly, or both, for recovery of all damages resulting from such injuries in an amount to be proven at trial. Plaintiff seeks recovery of all direct and consequential damages, including loss of sales, business, profits, value of assets no longer viable due to the current state of its business, and enterprise value. Plaintiff also is entitled to recover compensatory damages, including opportunity costs, expenses of counteracting the disparaging misimpressions created, exemplary damages, pre-judgment interest, post-judgment interest, and court costs.

94. All Defendants are jointly and severally liable for Plaintiff's damages hereunder. The actions, promises, representations, assurances, omissions, and deceit described and delineated are attributable to all Defendants directly or indirectly one and the same.

95. Defendants are directly liable for their own fraudulent conduct. Each was in relevant respects a direct and active participant, accomplice, and beneficiary of the fraudulent scheme to improperly induce, obtain, and disclose Plaintiff's confidential and proprietary wastewater treatment information and technology in a false, negative, and disparaging manner to

manipulate regulatory authorities to permit disposal wells instead of requiring wastewater treatment.

96. Defendants accordingly are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or actions alleged herein.

97. Defendants also are indirectly liable for the described and delineated actions, promises, representations, assurances, omissions, and deceit by and through the Enterprise including AMH and HMH and others acting in concert on agency, guiding spirit, alter ego, and ultimate beneficiary principles.

98. Each of the Defendants controlled the Enterprise including AMH and HMH. They exercised their control to fraudulently induce and otherwise deceive and defraud Plaintiff. Acting together as one and the same, the separate and collective knowledge and actions of Defendants and the Enterprise including AMH and HMH and others acting in concert are imputed between and amongst themselves and their progeny.

**Count II: Constructive Fraud**
**(Against All Defendants Directly and/or Indirectly)**

99. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as if set forth herein.

100. Defendants directly and indirectly by and through the Enterprise including AMH and HMH and others acting in concert committed constructive fraud on Plaintiff by their conflicted and dishonest misuse of Plaintiff to their own advantage and improper benefit. Without limitation, Defendants and others acting in concert committed constructive fraud by negligently, recklessly, or intentionally misrepresenting, both affirmatively and by omission, the true nature, character,

and extent of their interests and activities with respect to Plaintiff in inducing and disclosing Plaintiff's confidential and proprietary information for improper purposes. They altogether failed to disclose and otherwise masked their true purpose and intent in inducing Plaintiff to provide confidential and proprietary information for ulterior purposes in manipulating regulatory authorities to permit disposal wells instead of requiring wastewater treatment. They thereafter failed to disclose and otherwise disguised and concealed their unauthorized misuse of Plaintiff's confidential and proprietary information. They further excluded and otherwise failed throughout to provide true and timely information to Plaintiff as legitimate stakeholders in Plaintiff's confidential and proprietary information, and failed to effectively, fairly, and impartially conduct themselves by, among other things:

i. orchestrating and masking Defendants' purpose and intent;

ii. subverting Plaintiff's business interests, purpose, and intent;

iii. failing to keep Plaintiff informed of significant information and changes in circumstances that would have impacted Plaintiff's interests;

iv. failing to request or obtain Plaintiff's informed consent;

v. suppressing and otherwise omitting material information both before and after Plaintiff provided Plaintiff's confidential and proprietary information;

vi. failing to act in Plaintiff's best interest with respect to Plaintiff's confidential and proprietary information;

vii. acting in bad faith in favor of their own financial interests and positions;

viii. acting in bad faith and in reckless disregard for the interest of Plaintiffs; and

ix. failing to maintain Plaintiff's confidential and proprietary information by improperly and illicitly preparing, furnishing, and submitting confidential and proprietary information to regulatory authorities; and

x. manipulating Plaintiff's confidential and proprietary information to place Plaintiff in a negative light and disparage the feasibility of Plaintiff's products and services.

101. In sum, Defendants directly and indirectly by and through the Enterprise including AMH and HMH and others acting in concert failed in all important respects to manage and protect Plaintiff's confidential and proprietary information and interests in the legally required manner. Defendants' acts and practices offended established public policy of nondisclosure of confidential information, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to Plaintiff and public interests.

102. The actions and failures to act by Defendants and others acting in concert were premised, in part, on their self-interested violation of Plaintiff's confidences and exploitation of the gap between them and Plaintiff regarding Defendants direction and control and the distorted picture they sought to create and exploit.

103. The actions and failures to act had a tendency to deceive others, including the Plaintiff.

104. Moreover, the deceptions fostered by the actions and failures to act by Defendants and others acting in concert injured serious and important public interests concerning principles of nondisclosure of confidential information, corporate governance, and the integrity of the regulatory system under which entities are formed and exist in the United States, which public interests are reflected in numerous criminal and civil statutes, regulations, and common law decisions seeking to insure that the disclosures and conduct corporate entities and their progeny are appropriate and otherwise timely, accurate and complete, and that insiders do not omit or misrepresent material facts for their own benefit.

105. The actions and failures to act are contrary to fundamental principles of corporate governance, regulatory oversight, jurisprudence, equity, and common sense. Even if dealing with Idaho authorities and disclosing Plaintiff's confidential and proprietary information made sense at

the time, doing it unilaterally and in secret and by disguise is indefensible. Nevertheless, it is what Defendants and others acting in concert did and thereafter perpetuated.

106. Defendants' constructive fraud was knowing, willful, wanton, malicious, and committed in flagrant mockery of applicable legal standards without justification or excuse.

107. Defendants' constructive fraud injured Plaintiff's assets, goodwill, present and future income-generating capacity and business, and has caused Plaintiff to lose a substantial part of the benefits of the wastewater treatment business relationships it had painstakingly developed over many years.

108. Plaintiff has valid wastewater treatment related business relationships and expectancies from which it reasonably could anticipate deriving economic benefits.

109. It was readily apparent to Defendants and the Enterprise including AMH and HMH and others acting in concert, and they actually knew, that Plaintiff had these business relationships and expectancies. Upon information and belief, they were aware of Plaintiff's preexisting and prospective contracts with other parties.

110. But for the improper and deliberate conduct by Defendants and the Enterprise including AMH and HMH and others acting in concert in directly and indirectly interfering with and preventing Plaintiff from maintaining, developing, and expanding its wastewater treatment related business relationships, Plaintiff would have further developed its business, expanded its business relationships, and met its business expectancies.

111. Defendants' direct and indirect conduct has led to a material diminution of the reputation and goodwill established by Plaintiff in its products and services. Defendants have injured and will continue to injure Plaintiff's business reputation, have tarnished Plaintiff's name and products, and have lessened the capacity of Plaintiff to attract and obtain business.

Defendants' conduct essentially discredited Plaintiff's viability and otherwise substantially curtailed its opportunities.

112. Defendants' have thus directly and indirectly deprived and will continue to deprive Plaintiff of the ability to control the market perception of its products, systems, and services offered by Plaintiff, placing its valuable reputation and goodwill in their hands. Plaintiff has thus lost the benefits of preexisting and prospective business relationships and thereby suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiff in its products.

113. Plaintiff hereby sues Defendants either directly and indirectly, or both, for recovery of all damages resulting from such injuries in an amount to be proven at trial. Plaintiff seeks recovery of all direct and consequential damages, including loss of sales, business, profits, value of assets no longer viable due to the current state of its business, and enterprise value. Plaintiff also is entitled to recover compensatory damages, including opportunity costs, expenses of counteracting the disparaging misimpressions created, exemplary damages, pre-judgment interest, post-judgment interest, and court costs.

114. All Defendants are jointly and severally liable for Plaintiff's damages hereunder. The actions, promises, representations, assurances, omissions, and deceit described and delineated are attributable to all Defendants directly or indirectly one and the same.

115. Defendants are directly liable for their own fraudulent conduct. Each was in relevant respects a direct and active participant, accomplice, and beneficiary of the fraudulent scheme to improperly induce, obtain, and disclose Plaintiff's confidential and proprietary wastewater treatment information and technology in a false, negative, and disparaging manner to

manipulate regulatory authorities to permit disposal wells instead of requiring wastewater treatment.

116. Defendants accordingly are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

117. Defendants also are indirectly liable for the described and delineated actions, promises, representations, assurances, omissions, and deceit by and through the Enterprise including AMH and HMH and others acting in concert on agency, guiding spirit, alter ego, and ultimate beneficiary principles.

118. Each of the Defendants controlled the Enterprise including AMH and HMH. They exercised their control to fraudulently induce and otherwise deceive and defraud Plaintiff. Acting together as one and the same, the separate and collective knowledge and actions of Defendants and the Enterprise including AMH and HMH and others acting in concert are imputed between and amongst themselves and their progeny.

## Count III: Declaratory Judgment
## (Against all Defendants)

119. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as if set forth herein.

120. A present and actual controversy exists between Plaintiff and Defendants concerning their rights and respective duties.

121. The NDA requires that parties to and otherwise bound by the NDA keep confidential and proprietary information strictly confidential and not disclose it to third parties or otherwise use it for unauthorized purposes.

122. The disclosure of Plaintiff's confidential and proprietary information to authorities in Idaho violated to the terms of the NDA.

123. The use of Plaintiff's confidential and proprietary information for purposes other than specified further violated the NDA.

124. This Court should afford Plaintiff the protection agreed upon in the NDA and declare that the unauthorized disclosures of Plaintiff's confidential and proprietary information violated the NDA.

125. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks a declaratory judgment declaring that the disclosures of Plaintiff's confidential and proprietary information as alleged herein violated the NDA.

126. Pursuant to 28 U.S.C. § 2202, Plaintiff is entitled to its costs and reasonable and necessary attorneys' fees related to this proceeding.

**Count IV: Civil Conspiracy**
**(Against All Defendants)**

127. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as if set forth herein.

128. Defendants knowingly acted in concert as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of intentionally and maliciously expropriating and misusing Plaintiff's confidential and proprietary information.

129. Each Defendant acted both individually and in alignment with the other Defendants and others acting in concert with full knowledge of their respective wrongful conduct. As such, Defendants and others acting in concert conspired together, building upon each other's wrongdoing, in order to accomplish the acts alleged herein.

130. Defendants direct and indirect conduct was contrary to numerous provisions of law, as stated herein.

131. There was a meeting of the minds between and among Defendants and the Enterprise including AMH and HMH and others acting in concert to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiff's damages as set forth herein.

132. As a result of the conduct of Defendants, Plaintiff has suffered injury to its business and property.

133. Each of Defendants participated in a civil conspiracy and are therefore liable for the acts of one another.

134. Defendants' actions and inactions constitute a conspiracy to engage in unlawful conduct as set forth herein.

135. Defendants accordingly are jointly and severally liable for Plaintiff's damages, all as set forth above and below.

**Count IV: Punitive Damages**
**(Against All Defendants)**

136. Because the Defendants' conduct constitutes fraudulent conspiracy, and because Defendants acted with malice and/or with heedless and reckless disregard for Plaintiff's rights in so acting, Defendants are jointly and severally liable for substantial punitive or exemplary damages. An award of not less than ten (10) times the actual damages incurred is necessary to present any substantial deterrents to such unlawful and deceitful conduct; and Plaintiff hereby requests that the trier of fact award not less than ten (10) times the actual damages suffered as punitive or exemplary damages from each Defendant, respectively.

**Count V: Piercing the Corporate Veil**
**(Against All Defendants)**

137. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as if set forth herein.

138. As otherwise herein alleged, Defendants are additionally and/or alternatively liable for the described and delineated actions, promises, representations, assurances, omissions, and deceit by and through the Enterprise including AMH and HMH and others acting in concert on agency, guiding spirit, alter ego, and ultimate beneficiary principles.

139. As described, the Enterprise including AMH and HMH are mere instrumentalities of Defendants without any separate and independent mind, will, or existence of their own.

140. As further described, the Enterprise including AMH and HMH have been dominated by Defendants.

141. Defendants and others acting in concert created and controlled the Enterprise including AMH and HMH as their personal domain. They then exercised their control over the Entity Defendants to wrongfully attain and misuse Plaintiff's confidential and proprietary information.

142. Acting together as one and the same, the collective knowledge and actions of Defendants and the Enterprise including AMH and HMH and others acting in concert are imputed between and amongst themselves.

143. The actions, representations and omissions described and delineated are all accordingly imputed and attributable to Defendants as agents, guiding spirits, alter egos, and ultimate beneficiaries.

144. By and through the described and delineated actions, promises, representations, assurances, omissions, and deceit by the Enterprise including AMH and HMH and others acting

in concert, Defendants knowingly participated in the fraudulent scheme and conspiracy to illicitly and improperly attain and misuse Plaintiff's confidential and proprietary information.

145. As a result of the illicit and dishonest scheme to wrongfully attain and misuse Plaintiff's confidential and proprietary information Defendants usurped and otherwise thwarted and expropriated Plaintiff's interests.

146. Plaintiff accordingly is entitled to pierce the corporate veil of the Enterprise including AMH and HMH to impose liability on the Defendants for the imputed actions, promises, representations, assurances, omissions, and deceit of the Enterprise including AMH and HMH by and others acting in concert under agency, guiding spirit, alter ego, and ultimate beneficiary principles.

147. As alter egos of the Enterprise including AMH and HMH, Defendants are jointly and severally liable for Plaintiff's damages, all as set forth above.

## VI. JURY DEMAND

148. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendants, finding them jointly and severally liable to Plaintiff, and praying specifically that Plaintiff have relief and judgment, as follows:

i. declaring that Defendants' disclosures of Plaintiff's confidential and proprietary information violated the NDA;

ii. awarding compensatory damages in favor of Plaintiff for its claims against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment interest and post-judgment interest at the maximum rate(s) permitted by law or equity;

iii. punitive and/or exemplary damages from each Defendant, respectively in an amount which Plaintiff may show to be appropriate in this cause, but in any event, not less than ten (10) times the actual damages suffered;

iv. reasonable attorneys' fees and costs as applicable; and

v. all other relief in law and equity to which Plaintiff may be entitled.

Dated: November 15, 2022

Respectfully Submitted,

/s/ Walter J. Scott, Jr.
**Walter J. Scott, Jr.** (SBN: 17918405)
S.D. Bar No. 577232
skip@scott-llp.com
**George T. Scott** (SBN: 24061276)
S.D. Bar No. 3006923
jorde@scott-llp.com
**SCOTT LAW GROUP LLP**
Walter J. Scott, Jr.
PO Box 93198
300 State Street
Southlake, Texas 76092
P: (214) 755-1978

**COUNSEL FOR PLAINTIFF**